**CABINET FOR HEALTH AND FAMILY SERVICES, Commonwealth of Kentucky, Appellant,**

v.

**I.W., JR.; R.S.; and M.W., an Infant, Appellees.**

**No. 2010–CA–000301–ME.**

Court of Appeals of Kentucky.

Dec. 17, 2010.

---

5. *See* Respondent's Response to Movant's Motion for Discretionary Review, April 08, 2009.

**296**

Sheila F. Redmond, Lexington, KY, for appellant.

No Brief for appellees.

Before LAMBERT and STUMBO, Judges; SHAKE,[1] Senior Judge.

## OPINION

LAMBERT, Judge:

This is a termination of parental rights case in which the Cabinet for Health and Family Services appeals from a judgment of the Clark Family Court denying the petition to terminate the parental rights of Appellee, I.W., Jr. For the reasons stated herein, we reverse the family court's order and remand this matter for termination of the parental rights of Appellee, I.W., Jr.

Appellee, I.W., Jr. has failed to file a brief. Accordingly, we will set forth the Cabinet's statement of facts and issues, presuming such to be correct. Kentucky Rules of Civil Procedure (CR) 76.12(8)(c).

M.A.W., the child who is the subject of this action, was born on April 15, 2002. The mother of the child is R.S., and the father of the child is R.S.'s stepbrother, I.W., Jr. (Appellee). Appellee's father, I.W., Sr., and R.S.'s mother, M.W., were married when R.S. was approximately six years old and Appellee was approximately thirteen years old. When Appellee was fourteen, he came to live with his father and M.W., and he lived in the same household with R.S. as a teenager for approximately two and one-half years.

Appellee and R.S. first engaged in a sexual relationship when Appellee was twenty-three or twenty-four years old and

---

1. Senior Judge Ann O'Malley Shake sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

R.S. was sixteen. This relationship began when Appellee was married to C.W. and continued over the course of approximately ten years. Appellee described that the relationship was consensual; however, he admitted that at times R.S. had accused him of raping her. Appellee stated in his parenting evaluation that R.S. could not be "raped," although it is not clear from the record exactly what this statement meant.

Appellee's father, I.W., Sr., sexually abused R.S. as a child, and they had a sexual relationship as adults. Appellee testified that he did not know that his father was having sexual relations with R.S. At a minimum, however, Appellee knew that his father had engaged in sexual intercourse with R.S. because when he asked R.S. if the baby she was carrying was his, R.S. advised that she thought it was his father's (her stepfather's) child. Moreover, Appellee later stated during a parenting assessment that he thought his father was M.A.W.'s father, but that he did not believe his father was a sex offender. However, Appellee admittedly knew that his father had engaged in sexual relations with R.S. since she was a child. Appellee also admitted to a social worker, April Frost–Crowe, that he thought his father was M.A.W.'s father, and that he was aware when he was having sexual relations with R.S. that his father was having sexual relations with her too. Thus, it is clear from the record that Appellee was in denial regarding his father, I.W., Sr., and R.S.'s sexual relationship.

In mid to late 2001, Appellee apparently felt guilty about his own sexual relationship with R.S. and advised his wife, C.W., of the affair. Some months later, upon learning that R.S. was approximately seven months pregnant with M.A.W., Appellee and his wife discussed the possibility of whether the child was his. C.W. advised Appellee to determine whether he was M.A.W.'s father. When Appellee inquired about paternity to R.S., she allegedly told him that she had a menstrual cycle after they had sexual relations. Appellee and C.W. then took no further steps to determine whether or not Appellee was M.A.W.'s father, even though they both acknowledged that R.S. was a "habitual liar." C.W. testified that even though she and Appellee knew they should take further steps, they did not do anything more to determine if he was the father of M.A.W.

In the first four years of his life, M.A.W. lived in a number of placements with his mother, stepfather, relatives, and foster care, and he was placed in five to six placements over the course of four years. Prior to his removal and current placement in March 2007, M.A.W. never lived in a stable home environment. Social worker April Frost–Crowe testified as to the extensive and repeated history of abuse and neglect M.A.W. endured early in his life at the hands of R.S., K.S. (R.S.'s husband and M.A.W.'s stepfather), I.W., Sr. (Appellee's father), and M.A.W.'s sister, M.S.W. In addition, M.A.W. witnessed domestic violence perpetrated by his stepfather, K.S., against R.S.

M.A.W.'s first placement in foster care occurred in June 2005, when the Cabinet received a referral that M.A.W. and his older half-sister, M.S.W., were left home alone all day. M.A.W., then three years old, was found by police unattended and playing in the street. In January 2006, M.S.W. and M.A.W. were placed in the temporary custody of P.W. and J.W., M.S.W.'s biological father and stepmother. P.W. and J.W. had two biological children, M.E.W. and Z.L.W. (hereinafter "siblings")[2], who were living in the couple's

2. M.E.W. and Z.L.W. are not biologically re-

lated to M.A.W., though they were half sib-

home. In August 2006, the Fayette Circuit Court gave P.W. and J.W. permanent custody of M.S.W. and M.A.W.

In March 2007, the Cabinet received a referral from the police regarding a child fatality at the home of P.W. and J.W. Upon investigation, the Cabinet learned that ten-year-old M.S.W. had extensive injuries, numerous bruises, and scalding on her body, which resulted in her death. On that same date, M.A.W. (then four years old), his siblings, M.E.W. (then six years old), and Z.L.W. (then four years old) were all removed and placed in foster care together. At the time of the removal, M.A.W. was found to have light fading bruises on his upper back and ear. The investigation into M.S.W.'s death revealed that P.W. and J.W. killed M.S.W. in the presence of M.A.W. and his siblings. To date, the children have remained placed together in the same foster home since March 2007 and thus have been together for four years.

In April 2007, R.S. and C.J., Appellee's sister, came to social worker Frost–Crowe and asked for a home evaluation of Appellee's sister's home for possible placement of M.A.W. Frost–Crowe conducted a home evaluation and rejected C.W.'s home, due to the fact that R.S. was living on the same property in another trailer, and C.W.'s husband had a conviction for cruelty to animals. Appellee admitted that he had done some work on R.S.'s trailer with the intention of R.S. regaining custody of M.A.W.

In June 2007, after denial of C.W.'s home evaluation, R.S., C.W., and Appellee came to Frost–Crowe's office and indicated that Appellee might be M.A.W.'s father. Frost–Crowe advised the Fayette Family Court, who had jurisdiction at that time. The Fayette Family Court ordered DNA

testing and transferred the case to the Clark Family Court, where the juvenile court actions regarding M.A.W.'s siblings were located. In September 2007, DNA test results confirmed that Appellee was the biological father of M.A.W.

On February 7, 2008, the Clark Family Court adjudicated M.A.W. to be an abused and neglected child. On February 28, 2008, M.A.W. was committed to the Cabinet. Reasonable efforts to reunify M.A.W. with R.S. were waived pursuant to KRS 610.127. Appellee then moved the court for custody or visitation, and the Court ordered a parenting assessment by Dr. David Feinberg, a licensed clinical psychologist and qualified mental health professional, on Appellee and his wife, C.W.

Dr. Feinberg's report was completed on July 10, 2008. In August 2008, after reviewing that report, the Court waived reasonable efforts pursuant to KRS 610.127 as to Appellee and changed the goal for M.A.W. to adoption. Appellee's pending motion for custody or visitation was accordingly denied.

On February 20, 2008, the University of Kentucky Comprehensive Assessment and Training Services (CATS) issued a Sibling Separation Evaluation Report by order of the Clark Family Court. That report specifically evaluated the attachment between M.A.W. and his siblings and the impact separation would have on M.A.W. The report concluded that M.A.W. had experienced severe forms of neglect, including exposure to intimate partner violence and poor supervision by his mother and stepfather. In addition, the report noted that there were "multiple reports from collateral sources and from M.A.W.'s report to his current foster parents that he and M.S.W. experienced repeated sexual abuse by

lings to M.A.W.'s half-sister, M.S.W., who was killed. The experts who testified stated that

they are M.A.W.'s psychological siblings, as he has the longest history with them.

their biological mother and [M.A.W.'s] stepfather and parental substance misuse." The report stated that M.A.W. was exposed to severe forms of violence and observed his sister's death, allegedly at the hands of M.S.W.'s biological father and stepmother, P.W. and J.W. The report noted that M.A.W.'s early experiences were "severely traumatic and place him at a high risk for significant psychological difficulties and relational problems across his lifespan." In summary, the report concluded that M.A.W. should not be separated from his siblings, and that their sibling relationship should be maintained. Finally, the report concluded that establishing permanence for all three children in a timely manner was of the utmost importance.

The Clark Family Court conducted a trial on the termination of parental rights on August 21, 2009. At that trial, the Cabinet presented uncontroverted testimony from two key experts, Dr. Feinberg and licensed clinical social worker, Elizabeth Croney, who is the CEO and owner of Croney and Clark, Inc., and who provided intensive services to M.A.W. after his sister, M.S.W.'s death.

On October 21, 2009, upon the filing of a motion by Appellee, the trial court from the bench verbally denied the Cabinet's petition to terminate parental rights of the Appellee. The trial court stated that the Cabinet sustained its burden of proof as to abuse and neglect (KRS 625.090(1)), and one or more grounds existed under KRS 625.090(2), but that the Cabinet failed to sustain its burden of proof in proving that termination of Appellee's parental rights was "in the best interest" of M.A.W. In addition, the trial court found that Appellee had proved by a preponderance of the

evidence, pursuant to KRS 625.090(5), that M.A.W. would not be an abused and neglected child if returned to Appellee.[3] The trial court entered Findings of Fact, Conclusions of Law, and Judgment on November 18, 2009.

The Cabinet filed a motion to alter, amend, or vacate the judgment pursuant to CR 59.05 on November 30, 2009, and the Appellee filed a motion for visitation, both of which were heard by the trial court on December 15, 2009. The court denied Appellee's motion for visitation from the bench and took the Cabinet's motion to alter, amend, or vacate under advisement. On February 4, 2010, the court issued an order denying the Cabinet's motion to alter, amend, or vacate, but stated, however, that it was in M.A.W.'s best interest to remain in the custody of the Commonwealth. This appeal timely follows.

A family court's decision to terminate parental rights must be reviewed by this Court under a clearly erroneous standard as set forth in CR 52.01. *K.R.L. v. P.A.C.*, 210 S.W.3d 183, 187 (Ky.App. 2006). To terminate parental rights, the Cabinet must prove by clear and convincing evidence that: 1) the child has been abused or neglected; 2) termination would be in the child's best interest; and 3) one or more of the grounds listed in KRS 625.090 are present. *Id.* at 187–88. In the present case, the trial court found that M.A.W. was abused and neglected and that he had been in foster care under the responsibility of the Cabinet for fifteen of the most recent twenty-two months preceding the filing of the petition to terminate parental rights. Thus, elements one and three, above, were satisfied.

3. It is important to note that while the trial court made this ruling, M.A.W. had never been placed with or lived with Appellee. In fact, M.A.W. does not know Appellee or his wife, C.W.

Therefore, the central issue on appeal to this Court is whether the trial court properly determined that termination of Appellee's parental rights was not in the best interest of M.A.W. In other words, was it clearly erroneous for the Clark Family Court to find that the Cabinet failed to sustain its burden of clear and convincing evidence that termination was in M.A.W.'s best interest. "Clear and convincing evidence does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people." *M.P.S. v. Cabinet for Human Res.*, 979 S.W.2d 114, 117 (Ky.App.1998) (internal citation omitted). In reviewing a case on appeal, this Court must "give considerable deference to the trial court's findings and cannot disturb those findings *unless no substantial evidence exists in the record to support them.*" *K.R.L.*, 210 S.W.3d at 187. (Emphasis added). Because the trial court's determination that terminating Appellee's parental rights was not in M.A.W.'s best interest was not supported by any substantial evidence, we hold that it was clearly erroneous and thus reverse.

The evidence in this case overwhelmingly demonstrates that termination of Appellee's parental rights is in M.A.W.'s best interest. Perhaps the best evidence of this is the trial court's determination that M.A.W. should remain in the custody of the Cabinet and that Appellee should not obtain custody or visitation. Furthermore, the evidence in the record indicates that in the August 21, 2009, trial, the Cabinet introduced uncontroverted expert testimony from two witnesses, Dr. Feinberg and Elizabeth Croney. In addition, the trial court also had before it the undisputed sibling separation assessment completed by CATS. All three of these sources indicated that it would be detrimental, if not devastating, for M.A.W. to be moved from his current foster parents, who have expressed a desire to adopt M.A.W. along with his siblings. All three of these sources also indicated that the most difficult times in M.A.W.'s life had not even occurred yet and that the severe trauma and abuse M.A.W. suffered would emerge when he reached adolescence.

Dr. Feinberg testified that M.A.W.'s needs would increase as time went on, not decrease. His testimony was that permanency was paramount for M.A.W. and that leaving the question of parental rights open (as the family court is proposing by leaving M.A.W. in his current placement but not terminating Appellee's parental rights) would be detrimental to M.A.W. Croney testified that in March 2007, when M.A.W. came into foster care as the result of his sister's murder, he was a very fragile child who did not have good interaction with peers and had significant issues with attachment. Martha Razor, the CASA volunteer assigned to this case, testified that in the beginning, M.A.W. was the "most reticent child she had ever seen." Social worker Frost–Crowe testified that initially M.A.W. experienced night terrors, bed wetting, and defecating on himself.

The uncontradicted evidence in the case also indicated that M.A.W. has made great progress since being placed in his current foster home with his siblings. However, several expert witnesses testified that M.A.W. still struggles with attachment and is fearful that people are going to take him away at any time.

Dr. Feinberg testified as to his observations of M.A.W. with his foster parents. His testimony was that M.A.W. was comfortable with his foster parents, and was affectionate with them and accepting of their affection, which is very significant for a child diagnosed with Reactive Attach-

ment Disorder (RAD), as M.A.W. is. Dr. Feinberg also indicated that M.A.W. suffers from Post Traumatic Stress Disorder (PTSD) and depression.

Perhaps even more pertinent to the determination of whether terminating Appellee's parental rights is in M.A.W.'s best interests, Dr. Feinberg testified regarding Appellee's extreme physical limitations in caring for M.A.W. Specifically, Appellee described to Dr. Feinberg during the parenting assessment that he has tremendous pain, for which he takes narcotics. Moreover, because he is disabled, Appellee's wife testified that Appellee spends most of each day lying in bed and at times is unable to dress himself or care for their fifteen-year-old daughter. Dr. Feinberg testified that the implication of this information is that Appellee may not have the requisite mobility level to care for a small child. Appellee also advised Dr. Feinberg that he has an enlarged heart, a heart catheterization, and suffers from high blood pressure and high blood sugar.

Dr. Feinberg also testified to Appellee's intellectual deficits. Appellee tested to have a full scale IQ of 72, which is on the borderline range for mild mental retardation. In order to be able to care properly for M.A.W., Dr. Feinberg testified, a person must be able to ascertain whether M.A.W. can be protected, whether perils can be perceived, and whether there is a level of comfortableness working with therapists and professionals involved in treatment. Dr. Feinberg concluded that Appellee lacked the insight and understanding of the issues necessary to protect M.A.W. and provide a safe home and environment.

Finally, Dr. Feinberg noted that Appellee may have issues with chemical dependency, as noted by his criminal record and convictions for possession of marijuana and LSD, and his conviction for DUI. Dr. Fein-berg noted that Appellee was less than forthcoming with facts and information, and that he gave answers to questions about his substance abuse history that were simply not believable. Likewise, Dr. Feinberg testified that Appellee demonstrated an inability to accept responsibility for events in his past, such as his relationship with R.S., his father's sexual abuse of R.S. and M.A.W., and his failure to come forward as M.A.W.'s father.

Alternatively, Appellee offered *no* expert testimony to counter the expert opinions offered by the Cabinet. Instead, the only evidence offered by Appellee was his own testimony and the brief testimony of his wife, C.W., and sister, C.J. Included in this testimony was Appellee's admission that he did not seek immediate custody of M.A.W., nor did he seek to remove M.A.W. after he was aware that abuse was occurring in R.S.'s home. Furthermore, Appellee also testified that he will not be able to prevent M.A.W. from seeing R.S., K.S., and his own father, I.W., Sr., at family functions because "they are family." Thus, the trial court's determination that Appellee had met his burden of proving that M.A.W. would not continue to be abused or neglected is in error, as Appellee's direct testimony was that M.A.W. would continue to have a relationship with his abusers.

In summation, the uncontroverted testimony and evidence indicates that termination of Appellee's parental rights is in M.A.W.'s best interests. In fact, there is not a scintilla of evidence in the record indicating that it would be in M.A.W.'s best interest to have a relationship with Appellee. Not only has M.A.W. never had a relationship with Appellee, but Appellee would not even come forth as M.A.W.'s father or help remove him from an admittedly abusive home. In fact, Appellee tried to help R.S. regain at least visitation

of M.A.W. Not only is Appellee not capable of handling M.A.W.'s physical needs on a daily basis, he is demonstrably incapable of meeting M.A.W.'s extensive emotional needs, including therapy and counseling. Finally, the record clearly indicates that it is in M.A.W.'s best interests to remain with his siblings, who are all to be adopted by their current foster parents. If ever there were a case where termination of parental rights was appropriate, this is it.

Accordingly, because the trial court's findings were not supported by the evidence and were clearly erroneous, we reverse the November 18, 2009, order denying the Cabinet's petition to terminate parental rights and the February 4, 2010, order denying the Cabinet's motion to alter, amend, or vacate. This matter is remanded to the Clark Family Court for entry of an order terminating Appellee's parental rights.

ALL CONCUR.